# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| **vs.** | * | **Crim. No: 18-cr-294 (DLF)** |
| **LATASHA MOORE** | * | |
| **Defendant** | | |

* * * * * * * * *

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Defendant, Latasha Moore, ("Ms. Moore") by and through her attorney, William C. Brennan, Jr., submits this memorandum in support of the arguments to be presented by her at sentencing. This memorandum focuses on her acceptance of responsibility, her role in the offense, and the factors set forth in 18 U.S.C. §3553(a). Ms. Moore requests the Court to consider the information presented here when imposing a sentence that is "sufficient, but not greater than necessary, to comply with the purposes of sentencing."

## Requested Sentence

Ms. Moore respectfully requests that this Honorable Court fashion a sentence that would allow her to continue to raise her only child – a daughter – who is about to graduate from high school.[1] The sentencing options available are: a sentence of probation that would include a combination of conditions that substitute intermittent

---

[1] The graduation is scheduled for Wednesday, June 17, 2020.

confinement (weekends), community confinement (half-way house), or home detention (with location monitoring) for imprisonment. Another option would be a sentence of imprisonment that includes a term of supervised release with a condition that substitutes the aforementioned options for imprisonment. Any sentence should also include a requirement that Ms. Moore perform a substantial amount of community service, pay the special assessment of $100 and make restitution.

### Introduction

On September 28, 2018, the United States of America filed a one-count criminal Information charging Ms. Moore with bribery of a public official, in violation of 18 U.S.C. § 201(b)(2)(A). On October 11, 2018, Ms. Moore pleaded guilty to the criminal information pursuant to a written plea agreement.

On that date Ms. Moore was released on her own personal recognizance with conditions. Ms. Moore has successfully remained on supervised release since then. (Joint Status Reports, ECF# 11, 12, 13 & 14)

Ms. Moore is scheduled to appear before the Court on Tuesday, January 7, 2020 for sentencing.

### Plea Agreement and Guideline Considerations

According to the plea agreement and the Presentence Investigation Report ("PSR"), the base offense level for Count One is 14 pursuant to USSG §2C1.1(a)(1). Two levels are added because the offense involved more than one bribe, USSG

§2C1.1(b)(1). Twelve levels are added because the value of the benefit received in return for the payment was more than $250,000.00 but less than $550,000.00, USSG §2B1.1(b)(1)(G). Based on the above, the adjusted offense level for this offense is 28. (PSR ¶ 40).

In light of Ms. Moore's acceptance of responsibility and timely notification of her intention to plead guilty, the Government will recommend pursuant to USSG §3E1.1(a) and (b) a downward adjustment of three levels. (PSR ¶ 42 & 43). Therefore, the total offense level for Count One is 25. (PSR ¶ 44).

Ms. Moore has no prior experience with the Criminal Justice System. As such, she is properly assessed zero criminal history points, placing her in Criminal History Category I. Based on a Criminal History Category I and a total offense level of 25, the advisory sentencing guidelines range applicable to this case is 57 to 71 months of incarceration.

## A Reasonable Sentence in this Case

Counsel is confident that the Court is fully cognizant of the statutory sentencing scheme at 18 U.S.C. §3553(a) and the applicable case law of *United States v. Booker*, 543 U.S. 220 (2005), *Rita v. United States*, 551 U.S. 338 (2007), and *Gall v. United States*, 552 U.S. 38 (2007). Rather than rehash boilerplate language from previous sentencing memoranda, counsel will get right to the point.

Why should this Court impose a sentence that would essentially allow Ms. Moore to remain in the community to continue to raise her daughter? Four reasons: (1) her prompt acceptance of responsibility and cooperation; (2) the limited nature and circumstances of her role in the offense; (3) her unremarkable – but legally significant - history and characteristics; and (4) the need to promote respect for the law (including adequate deterrence).

The United States Supreme Court highlighted in *Pepper v. United States*, 562 U.S. 476 (2011) *quoting Koon v. United States,* 518 U.S. 81, 113 (1996), that the cornerstone of federal sentencing is to "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Id.* at 487. Ms. Moore is just such an individual who should be carefully viewed as having unique human failings.

### 1.  Prompt Acceptance of Responsibility and Cooperation.

Ms. Moore accepted personal responsibility for her conduct in this case early on – the very day that a search warrant was executed at her office. She participated in several proffer sessions with the Government and law enforcement including providing information about her involvement and the involvement of others in this case. Ms. Moore entered in to a cooperation plea agreement with the Government

and testified before the United States Grand Jury. She pleaded guilty on October 11, 2018 well before her co-defendant, John Woods ("Mr. Woods").[2]

Ms. Moore understands that the Government will be moving for a downward departure pursuant to USSG §5K1.1. She asks this Court to consider her early acceptance of responsibility and extensive cooperation with the Government in this case in assessing an appropriate departure for substantial assistance.

### 2.  Ms. Moore's Role in the Offense Conduct.

Ms. Moore committed a crime - bribery. As a public official she corruptly accepted something of value (money) to influence her in the performance of her official acts. While Ms. Moore will not receive a downward role adjustment for guideline purposes in this case, it is noteworthy to highlight her secondary role in this offense. To use a colloquial expression, "this was not her caper."

The Statement of Offense in support her plea (ECF# 6), the description of the Offense Conduct in her PSR (PSR¶ 9 – 27), the sentencing Memoranda submitted by both the defense and the government in Mr. Woods' case (Case No. 18-cr-390-DLF: ECF# 24 & 25) all thoroughly describe the crime in this case. It was bribery – but it was not bribery initiated, solicited or planned by Ms. Moore.

Ms. Moore's PSR agrees with this analysis. "John Woods was the organizer of this scheme, and he used defendant Moore to perpetrate the fraudulent activities.

---

[2] Ms. Moore's codefendant, John Woods, pled guilty on August 23, 2019.  (PSR ¶ 28).

. . Mr. Woods organized this scheme and recruited defendant Moore. . ." (PSR ¶ 29).

Ms. Moore's limited role needs to be further understood.

Ms. Moore first met Mr. Woods in 2000 when she was a 20 year-old clerical employee and he was a 38 year-old businessman/government employee. She viewed him as a "big brother." They became friends and he would occasionally give her gifts to help with her personal family situation. Mr. Woods knew that Ms. Moore was a single mother raising her daughter on her own. By 2014, Ms. Moore – then a college drop-out – was working as a career "mid to low level" civil servant with the DC Government. She had advanced from a clerical position to that of "Resources Allocation Analyst" with the DC Department of Human Resources ("DCHR"). She supervised no one and reported only to her supervisor – the Administrative Officer at DCHR.

By 2014, Mr. Woods - in contrast - was a college graduate from a prestigious university who had had a successful management career in business and who owned and operated several of his own businesses.[3] After leaving employment with the DC Government in 2006, Mr. Woods formed and managed a company called Center for Technology and Management. ("CTM"). In 2007 Mr. Woods through CTM had entered into a contract with Tai Pedro & Associates. ("TPA") to perform certain work on behalf of TPA for the DC Government.

---

[3] Woods Sentencing Memo, (Case No. 18-cr-390-DLF) ECF# 24, p. 8.

Beginning in 2013 one of Mr. Woods' other business ventures - B-Spot – a juice bar and art gallery - began having financial difficulties.[4] Mr. Woods first stole checks from TPA beginning in 2013 – six years after he began servicing the TPA contract with DCHR.[5]

Either by happenstance – or by devious advance planning by Mr. Woods - Ms. Moore had eventually become by 2014 the "main point of contact at DCHR" for the TPA contract serviced by Mr. Woods.[6]

As sometimes happens in bribery cases, Ms. Moore's descent into criminality was gradual. Her conduct morphed from doing routine copying of training materials for Mr. Woods, to occasionally helping him out with scheduling problems, to giving him a "head-up" (and not reporting) complaints about his work, to conducting positive performance evaluations for his work, to alerting him about DCHR's budget for advance payments, to finally approving numerous suspicious TPA invoices submitted by Mr. Woods.

Ms. Moore eventually had become Mr. Woods "eyes and ears" at DCHR and she "looked the other way" concerning any deficient performance by Mr. Woods.[7] She also recommended for approval his suspicious invoices submitted to DCHR.

---

[4] Woods, Sentencing Memo, ECF# 24, p. 8.
[5] Woods, Statement of Offense, ECF# 17, p. 3.
[6] Moore, Statement of Offense, ECF# 6, p. 2
[7] Woods, Statement of Offense, ECF#17, p. 2. Woods, Government Sentencing Memo, ECF#25, p. 2.

Mr. Woods' payments to Ms. Moore began in 2014 – seven years after his contract began with TPA – but only one year after he began experiencing financial difficulties with his other business, B-Spot.

Importantly, Ms. Moore had absolutely no knowledge that Mr. Woods had previously stolen five DC Government checks from TPA totaling $214,910.[8] Nor did she, at first, completely comprehend the full extent of Mr. Woods' fraudulent scheme with TPA and DCHR. She knew that CTM was performing work for DCHR; but she never questioned – as she should have – the suspicious invoices submitted by Mr. Woods ostensibly on behalf of TPA. She "looked the other way" and became Mr. Woods' "eyes and ears" and his "protection" inside DCHR.[9]

The modest gifts to Ms. Moore from Mr. Woods also evolved from occasional favors into actual regular check payments beginning in 2014 totaling $140,000 over three years (PSR ¶ 24 -25). Ms. Moore fully accepts that what she did was criminal. She will tell the Court at sentencing that she wonders to this day how she ever allowed herself to get involved in this crime.

As will be discussed more thoroughly *infra,* Ms. Moore was born, raised, and educated in the District of Columbia (PSR ¶¶ 49 – 50, 55, 61). All of her employment has been in the District of Columbia (PSR ¶ 63 – 66). She has never lived, gone to

---

[8] Woods, Statement of Offense, ECF# 17, p. 3.
[9] Moore, Statement of Offense, ECF# 6, p. 7.

school or worked anywhere else.[10] She performed clerical work from 1998 through 2002. She then worked as a staff assistant, then as a computer specialist registrar and was later promoted to an administrative position as a "Resource Allocation Analyst" with the DCHR (PSR ¶ 63).

Unlike Mr. Woods, Ms. Moore never graduated from an elite four-year college, never had a career in private industry, and never worked her way up a corporate ladder to become a regional manager. Most importantly, Ms. Moore never had the ability, training, wherewithal, experience or ambition to open her own business. She was a low-level administrator for a local government agency.

Mr. Woods was 18 years older, acted like a big brother to Ms. Moore, and owned and operated several companies. And when Mr. Woods began experiencing financial difficulties in 2013-2014, he approached his "little sister" - Ms. Moore - to "look the other way" and to give him a "head-up" about any problems at DCHR.

To use another colloquial expression – Ms. Moore was "ripe for the picking." Ms. Moore was seduced by false friendship, money and a feeling of importance and she succumbed to temptation – she accepted bribes and took official action as a result. Make no mistake, Ms. Moore fully accepts responsibility for her crimes.[11]

---

[10] To be completely accurate, Ms. Moore from time to time did live in an apartment complex in Prince George's County.

[11] The "loss" amount for bribery is calculated as "the value of the benefit received in return for the payment." USSG §2C1.1(b)(2). In this case the value received by Mr. Woods for his payments to Ms. Moore was $350,000 (PSR ¶ 27) which is a 12 level increase under the USSG. The value actually received by Ms. Moore was $140,000 which would only be an 8 level increase. USSG

However, counsel respectfully asks the Court to consider a "but for" question.

> *But for the financial problems of John Woods and his scheme to defraud TPA*
> *would Latasha Moore ever have become involved in any criminal activity?*

Counsel suggests that the answer is a clear and resounding – "no."

### 3.  History and Characteristics of Ms. Moore.

The PSR adequately summarizes Ms. Moore's offender Characteristics (PSR ¶ 48 72). Her personal and family data is noticeably unremarkable. She has not lived a sophisticated or glamorous life. Ms. Moore resides with her elderly parents and is a single mother raising her teenage daughter – whom she adores. Ms. Moore is so embarrassed about her involvement in this criminal conduct that she has not yet told her two brothers about her crimes (PSR ¶ 51).

Yet, despite her personal humiliation, those persons who have known and interacted with Ms. Moore over the years have come to her defense. While counsel for Ms. Moore could wax eloquently about her character, the best measure of a person can and should be gleaned from those who know her the best – in a family, employment, community and religious environment. Accordingly, counsel has attached to this memorandum, as Exhibit A, character letters from family, longtime friends and colleagues of Ms. Moore. They speak to her character, her generosity,

---

§2B1.1(b)(1)(E). The USSG require that the greater amount be used. Otherwise, Ms. Moore's total offense level would be 21 with a sentencing range of 37 to 46 months.

and her true humanity. These letters movingly describe the real person that is Latasha Moore.

### 4.  Promote Respect for the Law Including Adequate Deterrence.

Whenever good people become involved in non-violent criminal activity there is a legal collision between a defendant's innate goodness and the need to deter others from similar conduct. General, as opposed to specific, deterrence is a concern in this case as it is in most criminal cases. Ms. Moore has learned her lesson – there is no need to reform her conduct. However, what message can and should the Court send to deter others from similar conduct?

The basic rationale for general deterrence is that if there is no punishment others will attempt to engage in similar conduct – first with the hope that they will not get caught and second if they do get caught there will be little, if any, adverse consequences. Does the crime thereby become a risk worth taking?

In answering this conundrum there should be an acknowledgement that adequate deterrence is more than just "jail time." Human behavior is influenced by many factors – incarceration is but one of many negative inducements available. There are significant and far-reaching collateral consequences for committing a federal felony. Professionals and other government workers are often deterred more by the threat of job loss and diminished employment prospects than incarceration alone. Attempted illegal financial gain will result in significant financial loss.

Ms. Moore's adult life for the last 16 years – since age 22 – had been government employment. No more. Her future was full of promise and the prospect of a successful livelihood and eventual retirement. That is now over. Her future employment prospects are dismal. She will be excluded from government employment. She will be unable to be licensed in many if not all professions. Her ability to get "bonded" or otherwise trusted with other people's funds will be non-existent. Her personal humiliation among friends and family has been intense. Her personal identity is no longer that of a government worker – it is as a convicted federal felon. That is significant deterrence.

Depriving Ms. Moore of her freedom with intermittent confinement (weekends), community confinement (half-way house), or home detention (with location monitoring) in lieu of imprisonment would have a demonstrable and long-term effect on her conduct and the conduct of others. Again, why must it always be significant jail time? See *United States v. Qualls*, 373 F.Supp.2d 873, 877 (E.D. Wis. 2005) ("Generally, a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than is necessary to deter a defendant who has already served serious time yet continues to re-offend").

## Conclusion

Ms. Moore committed bribery – that is a crime that causes the public to lose confidence in government. So, punishment must be imposed. But, as stated in the beginning of this Memorandum,

> The sentencing judge [is] to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue.

*United States v. Koon*, 518 U.S. 81, 113 (1996).

Undersigned counsel respectfully asks this Court to exercise leniency in this case, in part because it is clear that Ms. Moore's actions were an aberration, and the result of surrendering to temptation – a common human failing. Ms. Moore responded to this case in the most positive way possible. She pleaded guilty early and provided assistance to the United States.

Upon considering the sentencing range established by the United States Sentencing Commission; Ms. Moore's prompt acceptance of responsibility and cooperation with the government; the nature and circumstances of her secondary role in the offense; her history and characteristics; and the need to promote respect for the law (including adequate deterrence) this Honorable Court should find that a sentence of probation that includes a combination of conditions that substitute intermittent confinement (weekends), community confinement (half-way house), or home detention (with location monitoring) in lieu of imprisonment with a

requirement that Ms. Moore perform a substantial amount of community service, pay the special assessment of $100 and make restitution  is "sufficient, but not greater than necessary" to comply with the purposes of sentencing set forth in 18 U.S.C. §3553(a).

Ms. Moore is prepared to respect and serve whatever sentence is imposed by this Honorable Court and is determined to return to her family and her community a better person.

December 30, 2019                                    _____/s/_____
                                                    William C. Brennan, Jr.
                                                    DC Bar Number: 926790
                                                    Brennan McKenna & Lawlor, Chtd.
                                                    6305 Ivy Lane, Suite 700
                                                    Greenbelt, MD 20770
                                                    301.474.0044 (phone)
                                                    301.474.5730 (facsimile)
                                                    wbrennan@brennanmckenna.com

## CERTIFICATES OF SERVICE

I HEREBY CERTIFY that on this 30th day of December, 2019, a copy of the foregoing Memorandum in Aid of Sentencing was delivered via ECF to the Office of the United States Attorney for this District of Columbia.

                                        _____/s/_____
                                        William C. Brennan, Jr.